FILED

2016 Oct-20  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM HOPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-02254-JEO |
| | ) | |
| SAM'S WEST, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this employment discrimination and retaliation action, William Hopkins asserts claims against his former employer, Sam's East, Inc. ("Sam's" or the "Company")[1], for retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; and associational discrimination under the ADEA. Sam's has moved for summary judgment on all three claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 25). Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that the motion for summary judgment is due to be granted.

---

[1] Sam's East, Inc. is incorrectly identified in the case style as Sam's West, Inc.

# I.  SUMMARY JUDGMENT STANDARD

Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring

the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS

### A.  Alleged Discrimination at the Sam's Club in Rome, Georgia

Hopkins was employed as a Market Manager for Sam's from May 2004 through September 14, 2012. (Hopkins Dep. at 30-31, 218).[2]  As a Market Manager, Hopkins oversaw the operation of 14 to 15 Sam's Club locations in Alabama, Georgia, and Tennessee. (*Id.* at 30-31).  He reported directly to the Regional Manager of the Mid-South, a position held by Michael Mainer as of May 2012 and by Kelvin Buncum before that. (*Id.* at 33-34; Mainer Dep. at 12).[3] Hopkins's team included a Market Human Resources Manager. (*Id.* at 36).  Josh Jones became the Market Human Resources Manager in 2012. (*Id.* at 55, 83-84).

---

[2] The Deposition of William Hopkins ("Hopkins Dep.") and the exhibits thereto are located at Docs. 27-1 through 27-3.  Citations in this opinion are to the page numbers of the deposition.

[3] The Deposition of Michael Mainer ("Mainer Dep.") and the exhibits thereto are located at Doc. 27-4.  Citations are to the page numbers of the deposition.

In August 2012, Cassie Bell, the Regional Human Resources Manager for Sam's at that time, called Hopkins to discuss a number of issues that had been raised by associates (employees) at the Sam's Club in Rome, Georgia. (Hopkins Dep. at 38, 144-47).   Among the issues was a complaint by associate Rita Cawthon.   Cawthon, a cancer survivor, alleged that she had applied for a "fax and pull" position at the Rome Club, but that Jerry Mclean, the Manager of the Club, had denied her the position because he felt it was too physically demanding for her.[4] (*Id.* at 142-44; Doc. 32 at 3).   Cawthon also alleged that she had been locked in an office by an associate manager at the Club. (*Id.* at 146).

Following Hopkins's conversation with Bell, Hopkins, Bell, and Jones traveled to Rome to have "roundtable" discussions with the associates about their concerns.[5] (Hopkins Dep. at 145-46).   Before talking with the associates, Hopkins, Bell, and Jones discussed the fact that Cawthon's allegations would require a "Red Book" investigation. (*Id.* at 152-54).   A Red Book investigation is conducted whenever an allegation of discrimination arises at Sam's. (*Id.* at 135-36; Mainer

---

[4] A "fax and pull" associate, also known as a "click and pull" associate, receives orders from business customers via fax and then "pulls" the requested merchandise for the customers. (Hopkins Dep. at 143-44, 155).

[5] There is a discrepancy in the record as to when Hopkins, Bell, and Jones visited the Rome Club. In a written statement prepared by Hopkins, he states that they were in Rome on August 16 and 17, 2012. (Hopkins Dep., Exh. 22).  In a statement prepared by Jones, he states that they were in Rome on August 15 and 16, 2012. (Doc. 32 at 3).  This discrepancy, however, is immaterial for purposes of the motion for summary judgment under consideration.

Dep. at 16).   Red Book investigations are conducted through the Employment Advisory Services ("EAS") team at Sam's, which assigns an investigating manager responsible for the investigation. (Hopkins Dep. at 140-41 & Exh. 10).   According to Hopkins, there was no discussion regarding who would serve as the investigating manager with respect to Cawthon's allegations, although either Bell or Jones stated that EAS had been contacted. (*Id.* at 154-55).

According to Hopkins, the original plan was for Hopkins, Bell, and Jones to return to Rome the following week to investigate Cawthon's allegations. (Hopkins Dep. at 148-49).   However, Bell subsequently told Hopkins that she and Jones would not be going back to Rome and that he would have to "finish" the investigation by himself.[6]   (*Id.* at 149, 157-58 & Exh. 22).

Hopkins returned to Rome on August 23 or 24, 2012. (Hopkins Dep. at 150 & Exh. 22).   According to Hopkins:

> [T]he thing at the time was Rita [Cawthon] was making a bigger issue out of being locked in the office than she was not being picked for the fax and pull.   It's almost like she had moved on past that.   That didn't work out. It was done.   The other person was named.   You're not going to go back and undo that.
>
> So it's almost like that had settled in her mind, but she was adamant that she was locked in the office.   So to her, it's almost like

---

[6] According to Jones, he was scheduled to be in training the week after the visit to Rome. (Doc. 32 at 3).   Jones contends that Hopkins and Bell "spoke in the training room in Rome and [Hopkins] was going to have to follow-up with the Open Door concerns while [Jones] was in training." (*Id.*)   He also contends that he told Cawthon he was looking into her allegations and would follow up when he returned from his training. (*Id.*)

the ["]not being picked["] was a side note to the ["]I was locked in the office by the managers.["]

So the whole purpose in that was identifying was she locked in the office … not, what's going on with the manager. …

(*Id.* at 158). Hopkins reviewed video from the date of the alleged incident and took statements from Cawthon, McLean, and the assistant managers. (*Id.* at 158-60, 162-63). The statements "were primarily focused" on Cawthon's allegation of being locked in the office. (*Id.* at 170). However, Hopkins also discussed the fax and pull matter with both Cawthon and McLean. Cawthon stated that she "felt like she could do the job" but that McLean "did not choose her because he was worried about her being able to physically do the job …." (*Id.* at 151-52). McLean similarly stated that he felt the fax and pull position was "too physically demanding" for Cawthon and that he was "looking out for her" in not awarding her the position. (*Id.* at 161).

On August 25, 2012, Hopkins emailed a report to Bell and Jones, along with the statements he had taken "in regards to associate Rita Cawthorn [sic] and being locked in the office." (Hopkins Dep. at 163-64 & Exh. 14). In his report, Hopkins primarily addressed Cawthon's allegation that she had been locked in an office. (*Id.*, Exh. 14). He did mention that Cawthon "was also very upset that she didn't receive the FNP [fax and pull] job the day prior," but included no other details

about that matter. (*Id.* at 165 & Exh. 14)  Hopkins determined that the office door had not been locked as Cawthon had alleged. (*Id.* at 150).

According to Hopkins, he attempted to follow up with Bell and Jones after emailing them his report, but they were unresponsive. (Hopkins Dep. at 166-67, 182).  Consequently, he decided to go back to Rome on September 5, 2012, to "coach" McLean on his fax and pull hiring decision, which Hopkins considered an act of discrimination.  (*Id.* at 167, 182-83).  According to Hopkins, "for [McLean] not to be held accountable for an act of discrimination was wrong." (*Id.* at 167). Hopkins did not discuss his decision to coach McLean with anyone in EAS or Human Resources, including Bell and Jones. (*Id.* at 182-83).

On the morning of September 5, 2012, hours before Hopkins followed through with his decision to coach McLean, Jones contacted Hopkins and asked him to send a copy of McLean's written statement.  When Hopkins responded by email that he had already sent the statement to Jones "a couple of weeks ago," Jones clarified that he was seeking a statement on the fax and pull hiring decision: "Jerry [McLean] did not write in his statement about the [fax] and pull position and selection. … I reach[ed] out to him yesterday to provide a statement.  He said he would complete by COB [close of business].  I never received his statement." (Hopkins Dep. at 166-68 & Exh. 15).  Hopkins then followed up with McLean, who stated that he had sent a statement on the fax and pull matter to Jones the night

before. (*Id.* at 168).  Nonetheless, McLean went ahead and transmitted a copy of the statement to Jones a second time. (*Id.* at 169-70).

At 5:08 p.m. on September 5, 2012, Hopkins issued a First Written Coaching to McLean, stating that McLean had "discriminated against an associate when making a hiring decision" and that McLean "should not make decisions to not allow someone a position based on his feeling that they may not be able to handle it physically." (Hopkins Dep. at 186 & Exh. 17).  According to Hopkins, he determined that a "first level" written coaching was appropriate because McLean had engaged in discrimination, but had not acted with malice or for personal gain and had the right intentions. (*Id.* at 186, 190; Exh's 18 & 22).

Just over one hour later, at 6:19 p.m. on September 5, Jones emailed Hopkins and asked: "Did you get a chance to review Jerry's statement?  I wanted to talk with you in regards to the Redbook and EAS bringing Legal in for a recommendation. … EAS and I are going to have a follow up call in the morning." (*Id.* at 177-78 & Exh. 16).  Hopkins did not see the email at that time because he was driving back to Alabama. (*Id.* at 178-79).

Less than an hour later, at approximately 7:00 p.m. on September 5, Hopkins participated in a previously-scheduled conference call with Bell and Jones. (Hopkins Dep. at 179-80).  According to Hopkins, the call had been scheduled because he could not get Jones to respond to him on anything, and had nothing to

do with the fax and pull matter. (*Id.* at 179-80).  During the call, however, either Bell or Jones mentioned the need to hold McLean accountable for his fax and pull hiring decision. (*Id.* at 180).  Hopkins immediately responded, "Hold on a second. I've already held him accountable.  I've already coached him.  I coached him today." (*Id.*)  Bell reacted with surprise and told Hopkins they would talk about the matter later. (*Id.* at 180-81).

After the call ended, Hopkins sent two emails to Jones.  In the first email, which was a response to Jones's email asking whether Hopkins had reviewed McLean's statement on the fax and pull matter, Hopkins stated that he "didn't realize you were doing a red book on this specific issue" and that he did not see "what would be in this statement alone enough for termination." (Hopkins Dep. at 177, 183-84 & Exh. 16).  In the second email, which was a further response to Jones's emails from that morning seeking McLean's statement on the fax and pull matter, Hopkins clarified that the statements he had previously provided to Jones "were in regards to the associate being locked in the office" and that while the fax and pull selection was "touched on" in the prior statements, that was just "to create the history" and was "not what [he] was inquiring about in these conversations." (*Id.* at 169-70 & Exh. 15).

Around the same time that Hopkins sent the two emails to Jones, Hopkins had a second telephone conversation with Bell.  Bell told Hopkins that they were

doing a Red Book investigation on Cawthon's discrimination allegation against McLean and that Hopkins should not have coached McLean. (Hopkins Dep. at 182). Hopkins replied that he was not aware of the Red Book investigation and that no one had been communicating with him. (*Id.*) Hopkins said that, based on what Bell was telling him, he "guess[ed] he shouldn't have coached" McLean, but reiterated that he was unaware of the "separate investigation into Jerry." (*Id.*)

One week later, on September 12, 2012, Bell issued an Investigation Summary report on the actions taken by Hopkins in his investigation of Cawthon's allegations. (Doc. 32 at 2). Bell noted that Hopkins "conclude[d] based on his coaching that the club manager, Mr. McLean, discriminated based on perceived disability due to [Cawthon's] cancer. Mr. Hopkins stated that he felt it captured the reason for the coaching. Mr. Hopkins stated he felt it was discrimination based on the medical challenges the associate had." (*Id.*) Bell concluded in her report that Hopkins "acted without a sense of 'no tolerance' for the company's Discrimination and Harassment Policy" and that Hopkins "did not follow the proper procedures for an alleged discrimination concern and the concern of the associate being locked in the manager's office." (*Id.*) She further concluded that Hopkins's "admission of discriminatory behaviors during the coaching process could open up significant liability for the company." (*Id.*)

On September 13, 2012, Mainer, the Regional General Manager for Sam's, interviewed Hopkins about his investigation and decision to issue a First Written Coaching to McLean. (Hopkins Dep. at 188-92 & Exh. 18). During the interview, Hopkins again stated that he reached out to Bell and Jones after sending them his "recap" of his investigation but got no response. (*Id.* at 190 & Exh. 18). He also admitted that no one else was involved in his decision to give McLean a First Written Coaching. (*Id.*, Exh. 18).

After speaking with Mainer, Hopkins prepared a written statement on how his investigation of Cawthon's allegations unfolded. (Hopkins Dep. at 255 & Exh. 22). As before, he stated that he did not realize Human Resources was doing a Red Book investigation into the fax and pull matter when he decided to coach McLean on September 5, 2012. (*Id.*) He further stated that he reviewed the Company's Discrimination and Harassment Policy and determined that "Jerry met the requirement for accountability based on his and others['] statements" and that "based on the fact that there was no malice or personal gain, the coaching would be at the level of a 1st written." (*Id.*) He concluded his written statement as follows: "If there was an active Red Book on the specific charge [against McLean], I should have known that, and as the Market Manager, I should have been in that loop. Had I been, I would not have coached Jerry prior to the conference call [on September 5, 2012]." (*Id.*)

11

On September 14, 2012, Sam's terminated McLean for, among other reasons, making the fax and pull hiring decision "based on inappropriate reasons not in accordance with our policies." (Hopkins Dep. at 192-93; Mainer Dep., Exh. 3).  That same day, Sam's terminated Hopkins as well. (Hopkins Dep. at 193, 218-22 & Exh. 19).  Hopkins's Exit Interview form states that he was terminated for "Misconduct With Coachings" and includes the comments that Hopkins failed to "follow the correct investigation protocol for handling a discrimination allegation"; utilized "inappropriate verbiage on a performance coaching"; exhibited "poor judgment" during the investigation; and failed to "leverage a HR partner." (*Id.*, Exh. 19).  Mainer, Bell, and Regional Asset Protection Manager Kevin Warn were present at the termination, although Mainer did most of the talking. (*Id.* at 219, 222).  According to Hopkins, Mainer stated that he was being terminated because he "put the company at risk by putting in writing that we discriminated against an associate." (*Id.* at 220).

**B.    Hopkins's Participation in an Age Discrimination Investigation**

Around the time that Cawthon's allegations were being investigated, Hopkins was interviewed by Felecia Collins-Wylie, a Regional Human Resources Manager at Sam's, concerning complaints that Mainer was "bullying" long-term associates. (Hopkins Dep. at 204-09; Mainer Dep. at 27).  Hopkins does not know who made the complaints. (Hopkins Dep. at 209).  According to Hopkins, he was a

"little guarded" in what he told Collins-Wylie, but did tell her that Mainer was harder on long-term associates than on short-term associates and mentioned three Club managers over age 50—Charles Long, Jerry McLean, and Stanley McGuire—who were "getting undue pressure … above and beyond the others." (*Id.* at 193, 207-10). Hopkins also mentioned to Collins-Wylie that Long's wife was being treated for cancer. (*Id.* at 204-05).

The day after Hopkins spoke with Collins-Wylie, Mainer called him and asked him how Long's wife was doing. (Hopkins Dep. at 205-06). According to Hopkins, he had not talked about Long's wife's cancer treatment with anyone except Collins-Wylie. (*Id.* at 210). Hopkins's conversation with Mainer concerned only Long and his wife. (*Id.* at 211). Mainer did not reference anything Hopkins had said about him to Collins-Wylie. (*Id.*) Hopkins admits that he does not know whether Collins-Wylie ever told Mainer what she had learned during her investigation of the complaints that Mainer was bullying long-term associates, and Mainer testified that he does not know if Hopkins had any involvement in that investigation. (*Id.*; Mainer Dep. at 29-30).

## C. Hopkins's Wife's Medical Conditions and Medical Expenses

Hopkins's wife suffers from several medical conditions. (Hopkins Dep. at 233). When Hopkins was employed at Sam's, he and his wife participated in medical insurance offered through Sam's. (Doc. 11 ¶ 31; Doc. 15 ¶ 31). According

to Hopkins, they would reach their out-of-pocket minimum every year, making their medical insurance very expensive. (Hopkins Dep. at 233-34).

According to Hopkins, Bell was aware of his wife's medical conditions and was aware that they were "maxing out" their medical insurance every year. (Hopkins Dep. at 235, 238-39). Hopkins contends that Mainer was also aware of his wife's medical issues and that "way before" he was terminated Mainer commented: "Your wife's got all these medical issues. It's costing y'all a fortune. I don't know how you keep going." (*Id.* at 234-35). According to Mainer, however, he did not learn about Hopkins's wife's medical issues until the day Hopkins was terminated, when he learned about the issues from Bell. (Mainer Dep. at 22-23).

According to Hopkins, Mainer stated at his termination: "We obviously know about your wife's situation and your medical expenses, and we feel really bad. So we've got a severance package here that should cover six months of COBRA insurance for you. We want to give this to you." (Hopkins Dep. at 220-21). According to Mainer, he did not make any comment to Hopkins at his termination about the costliness of his wife's medical treatment and did not hear Bell make any such comment. (Mainer Dep. at 24). Mainer admits, however, that Bell offered Hopkins six months of COBRA coverage and that Hopkins was asked to sign a waiver in exchange. (*Id.*)

**D.     Hopkins's EEOC Charge**

On February 12, 2013, Hopkins filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging that Sam's discriminated against him based on his race and age, in retaliation for his involvement in investigations pertaining to disability and age discrimination, and because of his association with his allegedly disabled wife. (Doc. 11-1 at 2-3).  The EEOC issued a Dismissal and Notice of Rights with respect to Hopkins's charge on September 26, 2014. (*Id.* at 5).  Hopkins then filed this action.

## III.  DISCUSSION

Hopkins's amended complaint contains three claims: a claim for retaliation under the ADA, a claim for retaliation under the ADEA, and a claim for associational discrimination under the ADEA.  The court will address each claim separately.

**A.     ADA Retaliation**

Hopkins's ADA retaliation claim is based on the allegation that Sam's retaliated against him for engaging in the "protected activity" of "opposing Jerry McLean's discrimination against Rita Cawthorn [sic] and participating in an investigation of McLean's discrimination." (Doc. 11 ¶ 41).  The Eleventh Circuit "asses[es] ADA retaliation claims under the same framework used in Title VII." *Palmer v. McDonald*, 624 F. App'x 699, 702 (11th Cir. 2015) (citing *Stewart v.*

15

*Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997)).
To establish a prima facie case of ADA retaliation, a plaintiff must demonstrate
that "(1) [he] engaged in a statutorily protected expression, (2) [he] suffered an
adverse employment action, and (3) there was a causal link between the two."
*Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).   If a plaintiff
establishes a prima facie case, the employer must articulate a legitimate, non-
discriminatory reason for the adverse employment action. *Davis v. Postmaster
General*, 550 F. App'x 777, 779 (11th Cir. 2013) (citing *Holifield v. Reno*, 115
F.3d 1555, 1565, 1567 (11th Cir. 1997)).   If the employer meets this burden, "the
burden shifts back to the plaintiff to show that the proffered explanation is a
pretext for retaliation." *Id.*

Here, Sam's argues that Hopkins's ADA retaliation claim fails because he
did not engage in protected activity and cannot, in any event, establish a causal link
between his alleged protected activity and his termination.   Sam's further argues
that it had legitimate, non-discriminatory reasons for terminating Hopkins that are
not pretextual.   Hopkins responds that he did engage in protected activity in
opposing disability discrimination, that his opposition to the discrimination was the
reason for his termination, and that the Company's alleged reasons for terminating
him are mere pretext.

1.    **Prima Facie Case**

a.  **Protected Activity**

The ADA prohibits retaliation against an employee who has "opposed any act or practice made unlawful by" the ADA (the "opposition clause") or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the ADA (the "participation clause"). 42 U.S.C. § 12203(a); *see also* 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against an employee because he has "opposed any practice made an unlawful employment practice" by Title VII or because he has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII).

In its initial brief, Sam's first argues that Hopkins cannot establish an ADA retaliation claim under the participation clause. (Doc. 26 at 16-17).  The court agrees.  The Eleventh Circuit has held that "at a minimum, some employee must file a charge with the EEOC or otherwise instigate proceedings under the statute for the conduct to fall within the purview of the participation clause." *Parker v. Econ. Opportunity for Savannah-Chatham Area, Inc.*, 587 F. App'x 631, 634 (11th Cir. 2014) (citing *EEOC v. Total Sys. Servs.*, 221 F.3d 1171, 1174 (11th Cir. 2000)).  Hopkins has not alleged or offered any evidence that Cawthon's allegation of discrimination was made in conjunction with the filing of an EEOC charge or

any other proceeding under the ADA. Moreover, Hopkins does not mention the participation clause in his brief and makes no argument that he has a valid claim under that clause. Consequently, Hopkins has abandoned any claim that he is entitled to protection under the ADA's participation clause. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *see also McMaster v. United States,* 177 F.3d 936, 940–41 (11th Cir. 1999) (noting that a claim may be considered abandoned when the allegation is included in the plaintiff's complaint but he fails to present any argument concerning the claim to the district court).

The court is satisfied, however, that Hopkins has shown that he engaged in protected activity under the ADA's opposition clause, at least for purposes of establishing a prima facie case of retaliation. The crux of Hopkins's retaliation claim is that he was terminated for opposing McLean's discriminatory conduct towards Cawthon. The Eleventh Circuit has held that "[a]lthough 'opposition' does not require 'active, consistent behavior,' it requires at least the disclosure of an individual's position or opinion on a matter." *Thampi v. Manatee Cnty. Bd. of Comm'rs*, 384 F. App'x 983, 990 (11th Cir. 2010) (citing *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 277 (2009)). Citing *Thampi*, Sam's

argues that Hopkins's retaliation claim fails because he has offered "no evidence that [he] *personally opposed* Mr. McLean's conduct" and that the coaching Hopkins gave McLean "demonstrates only [his] belief that Mr. McLean violated company policy, not [his] opposition to alleged unlawful conduct." (Doc. 26 at 15-16) (emphasis in original).  The court does not agree.

Hopkins's First Written Coaching to McLean unambiguously states that McLean "discriminated against an associate when making a hiring decision." (Hopkins Dep., Exh. 17).  His opposition to that discrimination is reflected in his unilateral decision to issue the First Written Coaching to McLean.  In addition, Sam's clearly understood Hopkins's "position or opinion" on the matter; in her Investigation Summary report, Bell noted that Hopkins "admits knowledge of events that are against the laws" and that Hopkins "conclude[d] based on his coaching that … McLean discriminated based on perceived disability" and "felt it captured the reason for the coaching." (Doc. 32 at 2).  In other words, Sam's was aware that Hopkins viewed McLean's conduct as constituting disability discrimination and that Hopkins believed the conduct warranted discipline (coaching).

In its reply brief in support of its motion for summary judgment, Sam's also argues, for the first time, that Hopkins did not engage in protected activity under the so-called "manager rule," citing the Eleventh Circuit's opinion in *Brush v.*

*Sears Holdings Corp.*, 466 F. App'x 781 (11th Cir. 2012). (Doc. 31 at 2-3). The manager rule holds that "a management employee [who], in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in "'protected activity.'" *Id.* at 787. In *Brush*, the Eleventh Circuit found the manager rule to be "persuasive and a viable prohibition against certain individuals recovering under Title VII." *Id.*

As an initial matter, the court notes that it is improper for a party to present a new argument in a reply brief, as Sam's has done here. *See, e.g., Brown v. CitiMortgage, Inc.*, 817 F. Supp. 2d 1328, 1332 (S.D. Ala. 2011) (noting that "it is improper for a litigant to present new arguments in a reply brief" and that such arguments "are generally not considered by federal courts"). Sam's does not argue or even mention the manager rule anywhere in its motion for summary judgment or initial brief, and consequently Hopkins did not have an opportunity to respond to that argument.

The court also notes that *Brush* is an unpublished opinion. Unpublished opinions of the Eleventh Circuit may be cited as persuasive authority, but they are not considered binding precedent. *See* 11th Cir. R. 36-2. As concerns the persuasive authority of *Brush*, the court observes that the two cases cited by the *Brush* panel as "creating" the manager rule—*McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996), and *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th

Cir. 2008)—involved claims under the Fair Labor Standards Act ("FLSA"), not Title VII.  Other circuit courts have refused to apply the manager rule to Title VII claims. *See DeMasters v. Carilion Clinic*, 796 F.3d 409, 421-22 (4th Cir. 2015) (noting that the manager rule has been applied in the context of retaliation claims under the FLSA but concluding that the rule does not apply to Title VII); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) (holding that "the only qualification … placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable" and noting that "there is no qualification on who the individual doing the complaining may be"); *but see Weeks v. Kansas*, 503 F. App'x 640, 642 (10th Cir. 2012) (applying the manager rule to a Title VII retaliation claim).  The court is not convinced that the manager rule should be applied to bar Hopkins's ADA retaliation claim here, especially when Hopkins went beyond merely investigating Cawthon's discrimination allegation and unilaterally coached McLean on his conduct.  Regardless, the court need not decide that issue at this time, because (as discussed below) the court is otherwise convinced that Sam's had legitimate, non-discriminatory reasons for terminating Hopkins and that its reasons are not pretextual.  Even assuming that the manager rule does not apply and that Hopkins did engage in protected activity, his ADA retaliation claim still fails.

### b.  Causal Connection

To prevail on his ADA retaliation claim, Hopkins must show that his protected activity was a "but-for" cause of his termination. *Frazier-White*, 818 F.3d at 1258.  "To establish a causal connection, the plaintiff must show that the decisionmaker was aware of his protected conduct, and that the protected activity and adverse action were not wholly unrelated." *Clemons v. Delta Air Lines Inc.,* 625 F. App'x 941, 945 (11th Cir. 2015) (citing *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013)).  "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Here, Sam's terminated Hopkins just nine days after it learned that he had coached McLean for discriminating against Cawthon.  Sam's stated in Hopkins's Exit Interview that he was terminated for "Misconduct With Coachings." (Hopkins Dep., Exh. 19).  This "close temporal proximity" is sufficient to establish a causal connection between his protected activity—his opposition to McLean's discrimination—and his termination.  Accordingly, Hopkins has established a prima facie case of ADA retaliation.

## 2.      Legitimate, Non-Discriminatory Reasons and Pretext

Hopkins having established a prima facie case of ADA retaliation, the burden shifts to Sam's to articulate legitimate, non-discriminatory reasons for his termination.  Sam's has done so.  Its reasons include Hopkins's failure to follow the correct investigation protocol for handling a discrimination investigation; his use of inappropriate verbiage on a written coaching; his exercise of poor judgment during the investigation; and his failure to leverage a Human Resources partner. (Hopkins Dep., Exh. 19).  All of these reasons relate to Hopkins's failure to follow Company procedures governing discrimination investigations.

Because Sam's has articulated legitimate, non-discriminatory reasons for terminating Hopkins, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace*, 376 F.3d 1079, 1087 (11th Cir. 2004).  To meet his burden, Hopkins must show both (1) that the reasons articulated by Sam's for his termination are not true, and (2) that the real reason for his termination was discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1983).  "If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to

summary judgment." *Wascura v. City of South Miami*, 257 F.3d 1238, 1246 (11th Cir. 2001).

Here, Hopkins argues that Sam's had "no basis in fact" for determining that he violated Company policy in his handling of the McLean discrimination investigation, asserting that he "acted within [C]ompany policy to complete the investigation Bell had instructed him to complete." (Doc. 28 at 12-13). He repeatedly emphasizes that Bell and Jones, the two Human Resources Managers who were supposed to be working with him on the investigation, were unresponsive when he reached out to them and "kept [him] in the dark" about a separate Red Book investigation. (*Id.* at 7). He contends that he "took the action [he] thought appropriate after not receiving the partnership from Bell and Jones he requested" and that "[t]he prompt remedial action he handed down was within [Company] policy." (*Id.* at 9).

Even construing the facts in a light most favorable to Hopkins, the facts do not support his argument that Sam's had no basis for determining that he failed to abide by Company policy in his discrimination investigation. First, the Company's Discrimination and Harassment Field Prevention Management Guidelines, which Hopkins admits he reviewed, state that all discrimination investigations "must be reviewed and certified by the MHRM [Market Human Resources Manager] or a higher level HR associate." (Hopkins Dep., Exh. 10). The investigation report

Hopkins submitted to Jones (his Market Human Resources Manager) and Bell (his Regional Human Resources Manager) addressed only Cawthon's allegation that she had been locked in an office.[7] (*Id.*, Exh. 14).   There is no evidence that Hopkins ever submitted a report to Jones or Bell on the results of his investigation into Cawthon's separate allegation of discrimination in the fax and pull selection. Indeed, Hopkins admitted in his email correspondence with Jones that the statements he obtained from Cawthon and McLean only "touched on" the fax pull decision and that the fax and pull decision was "not what [he] was inquiring about" when he talked with them. (*Id.* at 169-70 & Exh. 15).   In addition, it is undisputed that Hopkins's decision to issue a first level written coaching to McLean was never certified by Jones or Bell, who were unaware that he had decided to issue the coaching.   Even if Jones and Bell had been unresponsive when Hopkins endeavored to "partner" with them on the discrimination investigation, and even if Hopkins understood that he had been charged with "completing" the investigation, he was still required to submit his investigation to one or both of them for review and certification, and he did not do so.

Second, on the morning of September 5, 2012, hours before he coached McLean, Hopkins learned that Jones was looking for a statement from McLean on

---

[7] As noted above in the Summary of Facts, Hopkins's report mentioned that Cawthon was also upset about not receiving the fax and pull position, but included no other details about that matter. (Hopkins Dep., Exh. 14).

the fax and pull matter and that Jones had requested such a statement from McLean the day before. (Hopkins Dep., Exh. 15).  Therefore, even if Hopkins had been unaware that a "separate" Red Book investigation was being performed, he certainly knew (or, at the very least, should have known) that Jones was investigating the matter by the time he coached McLean.[8]   Despite such knowledge, Hopkins did not advise Jones that he was getting ready to coach McLean or seek any input from Jones regarding the level of coaching he had determined was appropriate.  Moreover, Hopkins has effectively admitted that he did not follow Company policy when he coached McLean, because he admits that if he had known about the Red Book investigation, he would not have—and should not have—coached McLean prior to speaking with Jones and Bell on the evening of September 5, 2012. (Hopkins Dep. at 182 & Exh. 22).  Even though it was only a matter of hours, Hopkins was on notice that Jones was, in fact, investigating the fax and pull matter before Hopkins coached McLean, yet he proceeded to coach McLean despite such notice.

Third, after Jones reviewed McLean's statement on the fax and pull matter, and before he was made aware that Hopkins had gone ahead and coached McLean on his own, Jones emailed Hopkins and asked for his input "in regards to the

_____

[8] As noted above in the Summary of Facts, Hopkins admits that when he went to Rome with Bell and Jones in mid-August 2012, they discussed the fact that Cawthon's allegations would require a Red Book investigation and that the Employment Advisory Services team had been contacted. (Hopkins Dep. at 152-55).

Redbook and EAS bringing Legal in for a recommendation." (*Id.*, Exh. 16).  Even if Jones (and Bell) had been unresponsive on prior occasions, it is clear from this email that Jones was not seeking to keep Hopkins "in the dark" about the Red Book investigation and in fact wanted his thoughts on the matter.  It is also clear from the email that the legal department was going to be consulted before any action was taken, which is consistent with the concerns expressed by Sam's about the verbiage used by Hopkins in the First Written Coaching he issued to McLean. It is undisputed that Hopkins did not consult with the legal department before coaching McLean.

Hopkins also argues that "Mainer made clear when he fired [Hopkins] that [his] opposition to McLean's discrimination against Cawthon was the reason for [his] firing," pointing to McLean's statements that "you put on paper that we discriminated against an associate. … You put the company at risk." (Doc. 28 at 8).  Hopkins also notes that his Exit Interview cites "inappropriate verbiage on a performance coaching" as a reason for his termination. (*Id.* at 8-9).  This evidence, however, merely establishes that Sam's had concerns about the language Hopkins used in his First Written Coaching and the potential liability it could create for the company, not that Sam's disagreed with his ultimate conclusion or that its true reason for terminating Hopkins was retaliation.  Indeed, the evidence is undisputed that Sam's agreed with Hopkins's conclusion and fired McLean for his

discriminatory conduct (a harsher outcome than the first level written coaching issued by Hopkins). Sam's was opposed to McLean's discrimination just as Hopkins was.[9]

Hopkins further argues that Sam's conducted only a "cursory investigation" before terminating him and that the "general hastiness" of his termination points to pretext. (Doc. 28 at 15-16). The court does not agree. The evidence reflects that before Sam's terminated Hopkins, Bell investigated the actions taken by Hopkins and issued a written Investigation Summary on her findings (Doc. 32 at 2); Mainer interviewed Hopkins regarding his decision to coach McLean (Hopkins Dep., Exh. 18); and Hopkins submitted a lengthy written statement setting forth his position on how his investigation of Cawthon's allegations unfolded and why he decided to give McLean a First Written Coaching. (*Id.*, Exh. 22). The investigation was anything but cursory.

Additionally, as Sam's points out in its summary judgment brief, "[Hopkins] has identified no similarly situated comparators who committed similar misconduct

---

[9] Hopkins states in his brief that "Bell and Jones never discussed holding McLean accountable until after [Hopkins] had disciplined him," implying that they would not have taken any action against McLean if Hopkins had not acted first. (Doc. 28 at 5). This statement is misleading in several ways. According to Hopkins, either Bell or Jones mentioned the need to hold McLean accountable *before* he advised them that he had already gone ahead and coached McLean. (Hopkins Dep. at 180). In addition, *before* Jones was made aware that Hopkins had coached McLean, Jones informed Hopkins that EAS would be seeking a recommendation from the legal department regarding McLean's conduct. (*Id.*, Exh. 16). Finally, although Hopkins asserts that Bell and Jones did not discuss Mclean's accountability with him (Hopkins), he has offered no evidence that they did not discuss the matter with each other or anyone else at Sam's.

but were not terminated." (Doc. 28 at 32).   A plaintiff "may show pretext by identifying a similarly situated employee who was not disciplined after engaging in similar conduct as the plaintiff," but "[the] comparator must be similarly situated to the plaintiff in all relevant respects, and the misconduct must be nearly identical to that of the plaintiff." *Rawls v. Ala. Dept. of Human Res.*, 507 F. App'x 895, 898 (11th Cir. 2013) (internal quotation marks omitted).   Nowhere in his brief does Hopkins even attempt to identify a similarly situated comparator who engaged in similar conduct but was not terminated.

In sum, Sam's has articulated legitimate, non-discriminatory reasons for terminating Hopkins, all stemming from his failure to follow the Company protocol for handling a discrimination investigation.   Hopkins has failed to make a showing sufficient to permit a reasonable jury to find that the reasons articulated by Sam's for his termination are not true, much less that the true reason was retaliation for his opposition to ADA discrimination.   It would be incongruous, to say the least, to find that Hopkins has a valid claim for ADA retaliation when he was neither the perpetrator nor the victim of the discrimination and the perpetrator was terminated for his conduct (and not simply given the written coaching Hopkins thought was sufficient).   Accordingly, the court concludes that Sam's is entitled to summary judgment on Hopkins's claim for ADA retaliation and that the claim is due to be dismissed.

### B.      ADEA Retaliation

Hopkins's second claim is for ADEA retaliation.  Similar to Title VII and the ADA, the ADEA prohibits an employer from discriminating against an employee because the employee has "opposed any practice made unlawful" by the ADEA or because the employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the ADEA.  29 U.S.C. § 623(d).  As with Title VII and the ADA, a plaintiff alleging retaliation under the ADEA establishes a prima facie case by showing that "(1) he engaged in a statutorily protected expression, (2) he suffered an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action." *King v. Adtran, Inc.*, 626 F. App'x 789, 792 (11th Cir. 2015) (citing *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993)).  "If a plaintiff establishes a prima facie case and the employer articulates a legitimate, non-retaliatory reason for the materially adverse action, the plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Id.* (citing *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999)).

Here, Hopkins alleges in his amended complaint that he was terminated in retaliation for engaging in the protected activity of "opposing and participating in

an investigation of Michael Mainer's discrimination against employees over age 50." (Doc. 11 ¶ 48).  As with Hopkins's ADA retaliation claim, Sam's argues that Hopkins cannot establish a retaliation claim under the participation clause of the ADEA, and once again Hopkins has not responded to that argument. Consequently, he has abandoned any claim based on the participation clause.

With respect to the opposition clause, Hopkins cites a single alleged instance of his opposition to ADEA discrimination at Sam's: his comments to Felicia Collins-Wylie (the Regional Human Resources Manager who investigated the allegations that Mainer was "bullying" older associates) that Mainer was harder on long-term associates and that three older associates were getting undue pressure from Mainer.[10] (Doc. 28 at 18).  For purposes of its motion for summary judgment, Sam's has conceded that Hopkins's comments to Collins-Wylie constitute protected activity under the ADEA. (Doc. 26 at 20).  Sam's argues, however, that Hopkins cannot establish a causal connection between those comments and his termination, and that his efforts to do so are based on nothing more than speculation. (Doc. 31 at 5-6).  The court agrees.

---

[10]At his deposition, Hopkins cited a number of other alleged instances in which he complained about the treatment of long-term associates at Sam's, but he does not mention or otherwise rely on any of those alleged instances in his brief.  The court notes that the other alleged instances all concerned complaints about the manner in which his former Regional Manager, Kelvin Buncum, treated long-term associates. (*See* Hopkins Dep. at 193-203).  In fact, when Hopkins was asked who he believed was targeting the three older associates he had identified in his amended complaint, Hopkins answered: "Kelvin Buncum." (*Id.* at 194).  Buncum was replaced by Mainer in May 2012. (Mainer Dep. at 12).

Hopkins asserts that, when he was questioned by Collins-Wylie during her investigation of the allegations against Mainer, he mentioned that Charles Long's wife was being treated for cancer.  According to Hopkins, the following day Mainer called him and asked him how Long's wife was doing.  Based solely on this unsolicited inquiry from Mainer, Hopkins infers that Collins-Wylie relayed their entire conversation to Mainer and made Mainer aware of Hopkins's comments regarding his treatment of older associates. (Doc. 28 at 18-19).  This inference, however, goes well beyond the bounds of "reasonable" inferences.  It is "not based on the evidence, but is pure speculation and conjecture" on Hopkins's part.  *Daniels*, 692 F.2d at 1324.  Hopkins admits that he does not know whether Collins-Wylie ever told Mainer what she had learned during her investigation. (Hopkins Dep. at 211). Hopkins also admits that his conversation with Mainer concerned only Long and his wife and that Mainer did not reference anything else Hopkins had discussed with Collins-Wylie. (*Id.*)  Mainer, for his part, has testified that he does not know if Hopkins had any involvement in Collins-Wylie's investigation and was unaware that Hopkins had made any reports that older workers had been mistreated. (Mainer Dep. at 27-30).  Hopkins has offered no evidence to the contrary.

Because Mainer had no knowledge of Hopkins's protected activity—his comments to Collins-Wylie regarding Mainer's treatment of long-term

associates—he could not have retaliated against Hopkins.[11]  *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). Therefore, no causal connection exists between Hopkins's protected activity and his termination.  Hopkins has failed to establish a prima facie case of ADEA retaliation, and the claim is due to be dismissed.[12]

## C.    Associational Discrimination Under the ADA

Hopkins's final claim is for associational discrimination under the ADA.  He alleges that he was terminated because of his wife's "disabilities," specifically her "medical conditions and the costs associated with them." (Doc. 11 ¶ 49).  To establish a prima facie case of associational discrimination, Hopkins must demonstrate that (1) he was subjected to an adverse employment action, (2) he was qualified for the job at that time, (3) he was known by Sam's at the time to have a relative with a disability, and (4) the adverse employment action occurred under circumstances that raised an inference that the disability of the relative was a determining factor in the decision.  *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1230-31 (11th Cir. 1999).  For purposes of its summary

---

[11] Hopkins does not allege that anyone else who was involved in his termination was aware of his protected activity.

[12] Even if Hopkins were somehow able to establish a prima facie case, his ADEA retaliation claim would still fail because, as discussed above, Sam's has articulated legitimate, non-discriminatory reasons for his termination and those reasons are not pretextual.

judgment motion, Sam's has assumed that Hopkins's wife suffers from one or more disabilities as defined under the ADA. (Doc. 26 at 21).  Sam's argues, however, that Hopkins's associational discrimination fails because he cannot establish that he was qualified for his position and cannot establish a causal link between his wife's disabilities and his termination. (*Id.* at 21-22).

Sam's argues that "by deviating from [the Company's] established practices and coaching, rather than terminating, a Club Manager in violation of [the Company's] anti-discrimination policies and without input from Human Resources, [Hopkins] demonstrated that he was not, at the time of his termination, qualified for his position as Market Manager." (Doc. 26 at 22).  The court does not agree.  Hopkins's failure to follow the Company's protocol for investigating and resolving the discrimination complaint against McLean may have constituted a legitimate, non-discriminatory reason to terminate him, but it does not establish that he was unqualified for his position, especially when he had held the position for many years.  Hopkins's deviation from Company policy may have warranted termination, but it does not equate to his being unqualified for his job.

However, the court does agree with Sam's that Hopkins has not shown that his termination occurred under circumstances raising an inference that his wife's disabilities were a determining factor in the decision to terminate him.  The crux of Hopkins's associational discrimination claim is that Sam's decided to terminate

him because he and his wife were "maxing out" their medical insurance every year. He has come forward with no evidence that would give rise to such an inference, such as evidence that his wife's medical costs were adversely affecting the Company's insurance rates or that the Company wanted to get his wife off its insurance plan.  In particular, Hopkins has adduced no evidence that Mainer, Bell, or anyone else who was involved in the decision to terminate him ever said anything negative about how much his wife's disabilities were costing Sam's, much less that they knew what those specific costs were.  To the contrary, the comments Hopkins attributes to Mainer reflect his (and the Company's) concern about the financial toll Hopkins's wife's medical issues were taking on Hopkins, not any frustration with what they were costing Sam's.  According to Hopkins, at one point Mainer commented that Hopkins's wife's medical issues must be "costing y'all a fortune" and that he didn't know how Hopkins kept going. (Hopkins Dep. at 234-35).  According to Hopkins, Mainer also stated at his termination that "[w]e obviously know about your wife's situation and your medical expenses, and we feel really bad." (*Id.* at 220-21).  These comments reflect sympathy and concern about the financial stress Hopkins was experiencing, as does the Company's offer of a severance package that would cover six months of COBRA coverage.  None of this evidence reflects any intent to discriminate against Hopkins or terminate him because of his wife's disabilities. *See Wascura*,

35

257 F.3d at 1246 (noting that the plaintiff, a city clerk who alleged association discrimination based on her son's medical condition, had adduced virtually no evidence of discriminatory intent and had "herself testified in deposition that she remembered several of the [city] Commissioners expressing sympathy, and none of the Commissioners expressing displeasure," when she told them about her son's medical condition).   Therefore, Hopkins cannot establish a prima facie case of association discrimination under the ADA, and Sam's is entitled to summary judgment on that claim.

Finally, as discussed in detail above, Sam's has articulated legitimate, non-discriminatory reasons for terminating Hopkins, and Hopkins has failed to adduce sufficient evidence to establish that those reasons are pretextual.   Even assuming that Hopkins could establish a prima facie case of association discrimination, his claim would still fail and Sam's would still be entitled to summary judgment.

## IV.  CONCLUSION

For the reasons discussed above, the court concludes that the Company's motion for summary judgment (doc. 25) is due to be granted and that all of Hopkins's claims are due to be dismissed.   An order consistent with this opinion will be entered.

**DONE**, this 20th day of October, 2016.

**JOHN E. OTT**
Chief United States Magistrate Judge